**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LORRAINE DAVIS,<br><br>Plaintiff,<br><br>v.<br><br>NORTHWELL HEALTH, INC. and CATHERINE CASTRO, in her individual and professional capacities,<br><br>Defendants. | Civil Action No.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Lorraine Davis ("Davis" or "Plaintiff") by and through her attorneys, Crabill PLLC, hereby alleges as follows against Defendants Northwell Health, Inc. ("Northwell," the "Hospital," or the "Company") and Catherine Castro ("Castro") (altogether, "Defendants"):

## PRLIMINARY STATEMENT

1. The Pregnancy Workers Fairness Act, "require[s] employers to make reasonable accommodations to allow pregnant workers to keep working, and prevent them from being forced out on leave or out of their jobs – helping ensure that no mother is forced to choose between the health of her baby and her job."[1]

2. Of course, pregnant "[w]omen should have every right to reasonable workplace accommodations as they provide for their families and contribute to the economy[.]"[2]

3. Disgracefully, Northwell's treatment of pregnant employees reveals that it subscribes to the plainly discriminatory and outdated belief that pregnant women are less capable and less valuable workers who do not belong in the workplace while pregnant.

---

1 https://www.shaheen.senate.gov/news/press/shaheen-ayotte-introduce-bipartisan-legislation-that-would-protect-pregnant-workers-from-workplace-discrimination (last visited on October 22, 2026).
2 *Id.*

4. The latest example of Northwell's blatant discrimination against pregnant woman is the Company's treatment of Davis, a hard-working Registered Nurse ("RN") in the Hospital's Oncology Medical-Surgical Unit ("Oncology Med-Surg Unit") who has dedicated over six years to Northwell and regularly received positive performance feedback.

5. In a clear act of discrimination, Northwell forced Davis on leave beginning on May 9, 2026 simply because she was pregnant.

6. At that time, Davis did not need or want leave.

7. Instead, Davis needed to be allowed to continue working with previously approved accommodations so that she could provide for herself, her children, and her unborn baby.

8. From April 20 to May 3 and on May 5 and 8, Davis successfully worked with the following reasonable accommodations that were initially approved by Northwell: (1) excused from lifting anything over ten pounds and (2) able to take short five-minute breaks to sit after standing continuously for one or two hours.

9. On April 30, 2026, Davis requested that Northwell temporarily permit her to continue working with her lifting and standing accommodations from May 4 to June 24, 2026.

10. Incredibly, even though the "Hospital determined that the lifting and standing restrictions [] would be accommodated and [] enable [Davis] to resume performing [her] regular RN duties[,]" Northwell forced Davis out on leave anyway.

11. In support of its decision, Northwell offered false and pretextual justifications that reveal the Hospital's decision to force Davis out on leave was motivated by a desire to expel her from the Hospital because she was pregnant.

12. First, around the time the Hospital forced Davis out on leave, Northwell repeatedly and erroneously claimed that the Hospital did not have any work for Davis and that leave was her only option.

13. At the very least, on May 9 and 12 and from May 14-22, there was work in Oncology Med-Surg Unit that could have been completed by Daivs.

14. Indeed, Davis was scheduled to work each of those days.

15. Ultimately, someone from the Hospital removed Davis from the work schedule and Northwell prevented her from working on the above-referenced dates.

16. Additionally, in mid- to late-May 2026, non-pregnant RNs in the Oncology Med-Surg Unit were permitted to work in a light-duty/administrative role and/or performed additional or overtime hours that could have been completed by Davis.

17. On May 13, 2026, Richie Estimos, an RN working in the Oncology Med-Surg Unit was assigned to work in a Light-Duty RN/Facilitator role, an unofficial position which requires an RN to focus primarily on the processing of admissions, discharges, and transfers.

18. On May 18, 2026, an RN named Ashley was called into work on her day off and worked in the Light-Duty RN/Facilitator role in the Oncology Med-Surg Unit.

19. On May 20, 2026, Amber Dowty, an RN in the Oncology Med-Surg Unit, was called into the Hospital and worked additional hours in the Light-Duty RN/Facilitator role beginning at around 9:00 a.m. until about 3:00 p.m.

20. Around late-May 2026, an email was sent to RNs in the Oncology Med-Surg Unit in which the RNs were asked if they were interested in picking up overtime hours on May 27, 29, and/or 30.

21. Unsurprisingly, Davis was excluded from the above-referenced email related to overtime hours.

22. Second, Northwell justified forcing Davis out on leave based on the false claim that Davis told HR that she could not perform CPR or other life-saving techniques because of vaginal bleeding related to her pregnancy.

23. Davis never told anyone at Northwell that she could not perform CPR or other life-saving techniques on patients because of vaginal bleeding.

24. In fact, Davis repeatedly told Northwell that should could perform CPR and other life-saving techniques with her accommodations.

25. Also, even though Davis had experienced vaginal bleeding in early April 2026 and informed Northwell about that bleeding, the Hospital permitted Davis to work with her lifting and standing accommodations from April 20 to May 3 and on May 5 and 8, 2026 without inquiring about her ability to perform CPR and other life-saving techniques with her accommodations.

26. Additionally, at the time of her April 30, 2026 request to continue working with her previously approved lifting and standing accommodations, Northwell was on notice that Davis was not experiencing any vaginal bleeding.

27. By that date, the Hospital had received two letters from Davis' OB/GYN stating that she was not experiencing vaginal bleeding.

28. Still, Northwell mandated that Davis take leave and threatened to fire her if she did not submit a formal request for leave.

29. Importantly, even if performing CPR or other life-saving techniques on patients are essential functions of her job as an RN and her lifting and standing accommodations would have

prevented her from preforming those techniques, Davis would have only temporarily been unable to perform those essential functions.

30. Indeed, in connection with her April 30 request, Davis only sought to briefly continue with her previously approved accommodations from May 4 to June 24, 2026.

31. As a result of Northwell's threat of termination which, if executed, would have left Davis with no job and needing to secure new healthcare while several months pregnant, Davis reluctantly submitted a formal request to take leave until June 27, 2026.

32. Immediately thereafter, Davis requested to returned to work on June 28, 2026 with an accommodation that would allow her to be exempt from lifting and turning patients.

33. On July 2, 2026, Northwell denied Davis's request.

34. To justify it decision, Northwell claimed that Davis's request for an accommodation to be exempt from lifting and turning patients prevented her from performing the essential functions of her job.

35. However, during a typically workday, an RN spends a total of only a few minutes lifting and turning patients, and those limited instances can be safely performed with the assistance of other hospital staff and/or mechanical lifting and repositioning equipment.

36. As such, personally lifting or turning patients constitutes only a minor and incidental part of the RN's work and is not an essential function of the RN position.

37. Again, even if lifting and turning were essential functions of the RN role, Davis would have only temporarily been unable to perform those essential functions because she requested to work with the accommodation from June 28, 2026 through October 28, 2026.

38. In connection with its denial of Davis's request to return to work with the lifting and turning accommodation, Northwell claimed that "[t]he Hospital also investigated whether

there is any current opportunity to have you return to perform limited administrative functions; however, currently this work is not available."

39. However, to date, Defendants have not discussed with Davis reasonable changes to her role as an RN that would allow her to continue working with her requested accommodations or any opportunities to work in any administrative or other role at the Hospital.

40. Northwell's decision to force Davis out on leave has caused her to expend accrued paid time off that she otherwise would not have been required to use and that she had planned to use, at least in part, to care for herself and her baby after giving birth.

41. Defendants' deplorable treatment of Davis described herein violates, *inter alia*, (i) Pregnancy Workers Fairness Act ("PWFA"), 42 U.S.C. §§ 2000gg, *et seq.*; (ii) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); (iii) Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*; (iv) the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL"), and (v) New York Labor Law ("NYLL") § 740.

## JURISDICTION AND VENUE

42. Pursuant to 28 U.S.C. §§ 1331, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under the PWFA, Title VII, and the ADA.

43. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's related claims arising under State law.

44. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PREREQUISITES

45. On September 17, 2026, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging, *inter alia*, discrimination and retaliation in violation of the PWFA, ADA, and Title VII.

46. Plaintiff received a Notice of Right to Sue from the EEOC on September 7, 2026.

47. Fewer than 90 days have passed since Plaintiff received her Notice of Right to Sue.

48. Any and all other prerequisites to the filing of this action have been met.

## PARTIES

### A. Plaintiff Lorraine Davis

49. Plaintiff is a resident of the State of New York and has been employed by Defendants from on or around December 1, 2017 through July 2021 and December 2023 through the present.

50. At all relevant times, Plaintiff was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

### B. Defendant Northwell Health, Inc.

51. Defendant Northwell Health, Inc. is a New York not-for-profit corporation with its principal place of business located at 2000 Marcus Avenue, New Hyde Park, New York 11042.

52. At all relevant times, Northwell was an "employer" within the meaning of all relevant statutes and regulations.

### C. Defendant Catherine Castro

53. Castro is a Nurse Manager at Northwell's location at 75 North Country Road, Port Jefferson, New York 11777 (the "Port Jefferson Location") and a resident of the State of New York.

54. At all relevant times, Castro was a "person" within the meaning of all relevant statutes and regulations.

## FACTS

## I. BACKGROUND

55. Northwell is a nonprofit healthcare system that owns and operates hospitals, medical practices, outpatient facilities, and other healthcare services that provide medical care to patients throughout New York.

56. On December 1, 2017, Davis joined Northwell as a Certified Nursing Assistant in the Oncology Med-Surg Unit at the Hospital's Port Jefferson Location.

57. In the Oncology Med-Surg Unit, the Hospital's employees provide inpatient care to adults with cancer who are recovering from surgery, receiving cancer treatment, or being treated for medical complications related to cancer or its treatment.

58. Soon after starting, Davis established herself as a hard worker and strong performer.

59. Around July 2021, Davis left Northwell and worked for a different employer until November 2023.

60. On or around December 1, 2023, Davis returned to the Hospital and started working as an RN in the Oncology Med-Surg Unit.

61. In that role, Davis assesses and monitors patients with cancer, administers medications and treatments, manages symptoms and complications, coordinates care, educates patients and families, and provides direct nursing care to support patients throughout their hospitalization.

62. The primary tasks Davis completes as an RN include (i) taking and monitoring patients' vital signs; (ii) administering oral, intravenous, and other medications; (iii) starting and

maintaining intravenous ("IV") lines; (iv) drawing blood and collecting specimens; (v) administering IV fluids and prescribed infusions; (vi) performing wound care and changing dressings; (vii) assessing and treating patients' pain and other symptoms; (viii) monitoring patients for changes in their medical condition and adverse reactions to medications and treatments; (ix) assisting patients with walking, transferring, repositioning, and other mobility needs; (x) assisting patients with eating and other activities of daily living when necessary; (xi) preparing patients for and assisting physicians with medical procedures and treatments; (xii) responding to falls, changes in condition, and other medical emergencies; (xiii) communicating patients' conditions and changes to physicians and other members of the treatment team; (xiv) educating patients and their families concerning medications, treatments, and discharge instructions; (xv) documenting patients' assessments, medications, treatments, and responses to care in their medical records; and (xvi) processing patient admissions, discharges, and transfers.

63. Throughout her employment with Northwell, Davis has received positive feedback related to her performance, including in written performance reviews.

## II. NORTHWELL APPROVES DAVIS'S REQUEST FOR PREGNANCY-RELATED ACCOMMODATIONS AND SHE EXCELS WORKING WITH THOSE ACCOMMODATIONS

64. In early March 2026, Davis learned the exciting news that she was pregnant.

65. A few weeks later, Davis disclosed her pregnancy to Castro, her direct supervisor and the Nurse Manager in the Oncology Med-Surg Unit.

66. Unfortunately, on April 3, 2026, Davis began experiencing vaginal bleeding.

67. Vaginal bleeding early in pregnancy can be concerning because it may signal a threatened miscarriage or other pregnancy-related complications.

68. On April 6, 2026, Davis met with her OB/GYN, Lisa Amorin, M.D. ("Dr. Amorin"), who practices out of Northwell's location at 222 Middle Country Road, Suites 210-212, Smithtown, New York 11787.

69. During the meeting, Dr. Amorin determined that Davis needed workplace accommodations because of her pregnancy and vaginal bleeding.

70. Specifically, Dr. Amorin found that that Davis should not lift anything over ten pounds or stand for more than one to two hours at a time.

71. Importantly, during a typical 12.5-hour shift, an RN usually spends a total of only a few minutes lifting and turning patients.

72. Also, when an RN must lift and turn a patient, the RN is usually assisted by other Hospital staff and/or mechanical lifting and repositioning equipment.

73. As such, personally lifting or turning patients constitutes only a minor and incidental part of the RN's work and is not an essential function of the RN position.

74. Soon after her meeting with Dr. Amorin on April 6, Davis sent a text message to Castro in which she told Castro about her vaginal bleeding and need for workplace accommodations.

75. In response, Castro said that she needed to speak about Davis's request for accommodations with Tara Matz ("Matz"), the Hospital's Chief Nursing Officer.

76. Also, Castro recommended that Davis get a doctor's note related to her request for accommodations.

77. In reply, Davis said "I told her I'm a nurse on a med-surg unit[.] [S]he said that's fine[,] just no lifting over 10 lbs or repetitive bending. But I'll reach out to her before they shoot the note over."

78. Later that day, Dr. Amorin provided Davis with a letter stating that she "must remain on light duty for work, with restrictions limiting lifting to under 10 lbs and standing to under 1-2 hours at a time." Ex. A (April 6, 2026 Letter from Dr. Amorin).

79. Davis then emailed the letter from Dr. Amorin to Castro.

80. On April 7, 2026, around 6:12 a.m., Castro sent Davis a text message in which she stated that she planned to speak with Matz about her request for accommodations at 8:30 a.m.

81. At 10:11 a.m., Castro sent Davis another text message in which she told Davis that she needed to submit her request for accommodations to the Hospital's Employee Health Services department which is also referred to as Team Member Health Services ("TMHS").

82. TMHS manages employees' work-related health needs, including medical clearances, workplace injuries and exposures, health restrictions, and fitness to work.

83. Castro also told Davis that she was required to stay out on leave until Northwell issued a decision on her request for accommodations.

84. Later that day, Davis called the TMHS office and spoke with Marie Caggiano ("Caggiano"), a TMHS Assistant.

85. During the call, Davis told Caggiano that she needed to request accommodations related to her pregnancy and vaginal bleeding.

86. Caggiano then instructed Davis to fill out Northwell's Modified Assessment Duty Form and to visit the TMHS office at the Port Jefferson Location for a meeting concerning her request and to provide the completed form.

87. The call between Davis and Caggiano ended soon thereafter.

88. After the call, Caggiano emailed Davis a copy of the Modified Assessment Duty Form.

89. Davis then provided the Modified Assessment Duty Form to Dr. Amorin and Dr. Amorin sent Davis a completed version that same day. *See* Ex. B (April 7, 2026 Modified Assessment Duty Form Completed by Dr. Amorin).

90. On April 10, 2026, Davis visited the TMHS office for a meeting about her request for accommodations.

91. At the TMHS office, Davis had a one-on-one meeting with a TMHS employee working in the office that day.

92. During the meeting, Davis and the TMHS employee discussed Davis's request and Davis provided the employee with the Modified Duty Form completed by Dr. Amorin.

93. After reviewing the form, the TMHS employee told Davis that limitations indicated by Dr. Amorin were supposedly too restrictive and it was unlikely that Northwell would grant her request.

94. However, likely because the Modified Duty Form is confusing and not intuitive, Dr. Amorin filled out the form incorrectly. *See id.*

95. For example, Dr. Amorin stated on the form that Davis could work three to four hours per day up to 12 times per week rather than correctly stating that Davis could work 12 hours per day up to three or four days per week. *See id.*

96. Also, Dr. Amorin erroneously said that Davis could stand for up to four hours per day instead of correctly stating that Davis could stand continuously for up to one to two hours before needing a break from standing. *See id.*

97. Davis told the TMHS employee that Dr. Amorin had filled out the form incorrectly and showed her Dr. Amorin's April 6, 2026 letter which correctly stated the accommodations Davis needed.

98. Next, the TMHS employee told Davis that Northwell needed Dr. Amorin to provide more information about the accommodations Davis was requesting, including information related to whether Davis could work 12.5-hour shifts.

99. The TMHS employee also said that Northwell did not require a new or revised Modified Duty Assessment Form from Dr. Amorin.

100. Instead, she stated that Dr. Amorin could provide a letter with the additional information they discussed.

101. Moments later, Davis and the TMHS employee called Dr. Amorin's office and spoke with a receptionist.

102. Davis and the TMHS employee told the receptionist that Northwell required Dr. Amorin to provide more information about the accommodations Davis needed, including information concerning whether she could work 12.5-hour shifts.

103. The receptionist replied that she would discuss the request for a new letter with Dr. Amorin and the call ended soon thereafter.

104. Next, Davis and the TMHS employee continued their one-on-one meeting.

105. Toward the end of the meeting, the TMHS employee told Davis that Northwell would likely grant her request for accommodations after she provided the letter from Dr. Amorin with the additional information about Davis's ability to work 12.5-hour shifts.

106. The TMHS employee then said that she would process Davis's request and told her that Northwell would likely issue a formal decision on her request in the next few days.

107. The meeting ended soon thereafter.

108. Soon after the meeting, Davis sent Castro a text message in which she said that TMHS had cleared her to return to work with her requested accommodations.

109. In reply, Castro told Davis that she was required to remain out on leave until Northwell provided notice of its official decision.

110. Castro also claimed that the accommodations Davis requested "go against what our light-duty RN role entails[]" and stated that she would be reaching out to TMHS "for further review."

111. Apparently, Castro wrongly assumed that Davis could only be accommodated through an unofficial position referred to as a "Light-Duty RN" or "Facilitator."

112. However, Davis's request for accommodations was not about whether she could fit into the "Light-Duty RN" or "Facilitator" role which is typically limited to performing admissions, discharges, and transfers while also being on standby to assist other RNs with their tasks.

113. Instead, Davis's request was about Davis and Northwell considering reasonable changes to her job as an RN that would allow her to continue working.

114. As mentioned above, as an RN, Davis is responsible for (i) taking and monitoring patients' vital signs; (ii) administering oral, intravenous, and other medications; (iii) starting and maintaining IV lines; (iv) drawing blood and collecting specimens; (v) administering IV fluids and prescribed infusions; (vi) performing wound care and changing dressings; (vii) assessing and treating patients' pain and other symptoms; (viii) monitoring patients for changes in their medical condition and adverse reactions to medications and treatments; (ix) assisting patients with walking, transferring, repositioning, and other mobility needs; (x) assisting patients with eating and other activities of daily living when necessary; (xi) preparing patients for and assisting physicians with medical procedures and treatments; (xii) responding to falls, changes in condition, and other medical emergencies; (xiii) communicating patients' conditions and changes to physicians and other members of the treatment team; (xiv) educating patients and their families concerning

medications, treatments, and discharge instructions; (xv) documenting patients' assessments, medications, treatments, and responses to care in their medical records; and (xvi) processing patient admissions, discharges, and transfers.

115. On April 13, 2026, Dr. Amorin provided Davis with an update letter related to her request for accommodations which included additional detailed about the requested accommodations. *See* Ex. C (April 13, 2026 Letter from Dr. Amorin).

116. In the letter, Dr. Amorin said, "The patient is requesting the following accommodations form 4/7-5/3. Limiting lifting to under 10 lbs, standing up to 2 hours at a time, with 5-minute breaks in between. Pt is able to work 12.5 hour shifts up to 4 days a week with no restrictions on walking." *Id.*

117. With the above-referenced accommodations, Davis could perform each of the job duties referenced in paragraph 114 above except assisting patients with walking, transferring, repositioning, and other mobility when those duties would require Davis to lift patients.

118. Davis emailed a copy of the letter she received from Dr. Amorin on April 13, 2026 to TMHS that same day.

119. The next day, Northwell's HR department sent Davis an email stating that the Hospital approved her request for accommodations for the time period April 14 to May 3, 2026. *See* Ex. D (April 14, 2026 Email Regarding Northwell's Approval of Davis's Request for Accommodations).

120. Northwell did not limit Davis to working in the Light-Duty RN/Facilitator role. *See id.*

121. Instead, Northwell approved Davis to continue working as an RN with the lifting and standing accommodations she requested.

122. On April 15, 2026, Castro sent Davis a text message in which she acknowledged that the Hospital had approved her request for accommodations.

123. On April 20, 2026, Davis returned to work at the Hospital.

124. From April 20, 2026 to May 3, 2026, Davis worked successfully with the lifting and standing accommodations Northwell approved.

125. During that period, even though her supervisors limited her to working in the Light-Duty RN/Faciliatory role, Davis *inter alia*, (i) processed admissions, discharges, and transfer; (ii) updated patients' profiles; (iii) educated patients and their families concerning medications, treatments, and discharge instructions; (iv) started and maintained IV lines; (v) administered IV fluids and prescribed infusions; (vi) checked patient's blood sugars; and (vii) helped fellow staff RNs with other tasks without incident.

## III. DEFENDATNS FORCE DAVIS OUT ON LEAVE AFTER SHE REQUESTS TO TEMPORARILY CONTINUE WORKING WITH HER PREVIOUSLY APPROVED ACCOMMODATIONS FROM MAY 4 THROUGH JUNE 24, 2026

126. On April 29, 2026, Davis met with Dr. Amorin related to her pregnancy.

127. During the visit, Dr. Amorin determined that Davis needed to continue working with the same above-referenced lifting and standing accommodations through June 24, 2026.

128. On April 30, 2026, Davis sent an email to TMHS's general email address and requested to continue working with her previously approved accommodations through June 24, 2026. *See* Ex. E (April 30, 2026 Email from Davis to TMHS).

129. In support of her request, Davis provided TMHS with another letter from Dr. Amorin which states:

> Ms. Lorraine Davis is a patient under my obstetrical care who is currently pregnant with a due date on 11/4/26. She has a high-risk pregnancy that has already been complicated by bleeding earlier in the pregnancy. I have instructed her to stay on light duty at work, as she is currently performing now, until she is at least 21 weeks

> pregnant and completes the anatomy ultrasound to show normal cervical length and placentation. That will be until at least June 24. Based on those sono results, can determine ability to return to full duty OR stay on light duty (if has placentation issue or other obstetrical concern).
>
> During this limited duty, [s]he is to limit LIFTING to UNDER 10 pounds; Limit STANDING to NO MORE than 2 hours at a time (MUST sit and rest for 5[-]minute breaks in between); She is able to work 12.5 hour shifts, up to 4 days a week, with NO restrictions on WALKING.
>
> Sincerely,
>
> Lisa Amorin

*Id.* at 3 (April 29, 2026 Letter from Dr. Amorin).

130. That same day, Davis called the TMHS office and spoke with an employee who told Davis that her request would be processed and that she should receive a decision from HR in the next few days.

131. The Hospital scheduled Davis to work on May 5, 2026.

132. That day, Davis reported to work at 7:45 a.m. for a shift that was scheduled to end at 8:15 p.m.

133. Around 3:45 p.m. on May 5, Michelle Tomasweski ("Tomasweski"), a Bed Coordinator, told Davis to end her shift early and leave the Hospital because there supposedly was not enough work for her.

134. Davis then clocked out and left the Hospital.

135. The Hospital scheduled Davis to work on May 8, 2026.

136. That day, Davis reported to work at 7:45 a.m. for a shift scheduled to end at 8:15 p.m.

137. Around 10:00 a.m. on May 8, Castro called Davis into the family lounge in the Oncology Med-Surg Unit and instructed her to stop working and go home.

138. In defense of her directive, Castro offered to two false justifications.

139. First, Castro claimed that the needs of the Hospital at that time did not require an RN on "light duty."

140. Again, Castro apparently believed that Davis could only be accommodated if through the Light-Duty RN/Facilitator role and only if there were admissions, discharges, and/or transfers that needed to be processed.

141. However, as stated above, Northwell approved Davis to perform her normal RN role with her lifting and standing accommodations.

142. At the time Castro dismissed Davis, an RN in the Oncology Med-Surg Unit was operating at a 7 to 1 nurse-to-patient ratio, meaning the RN was responsible for the care of seven patients.

143. To provide safe and quality care to its patients, the Hospital aims for a maximum 6 to 1 nurse-to-patient ratio in the Oncology Med-Surg Unit.

144. So, Davis could have assisted the overextended RN with caring for her patients.

145. Also, even if Castro's assumption that Davis could only be accommodated through the Light-Duty RN/Facilitator role was true, at the time Castro dismissed Davis, around nine patients in the Oncology Med-Surg Unit were waiting to be discharged and Davis could have processed those discharges.

146. Second, Castro claimed that allowing Davis to continue working was a "liability" because Northwell had not yet approved her request to continue under her previously approved lifting and standing accommodation through June 24, 2026.

147. However, Northwell had previously approved Davis to work with her lifting and standing accommodations and she successfully worked with those accommodations from April 20 to May 3 and on May 5 and 8.

148. Also, Northwell scheduled Davis to work on May 5 and 8 and Davis did work those days even though the Hospital had not yet issued a decision on her request to continue working with her previously approved accommodations.

149. Before Davis left the Hospital after being dismissed by Castro, Castro told Davis that she had "put out feelers" to other departments to see if they had work for her and would let her know by the end of the week whether there was work in other departments.

150. However, neither Castro nor anyone else from Northwell followed up with Davis about any opportunities to work in other departments or the lack of such opportunities.

151. That same day, Mackenzee Courtney ("Courtney"), an RN assigned to the Oncology Med-Surg Unit, asked Jessica Smith ("Smith"), an Assistant Nurse Manager, why Davis had been sent home even though their unit had discharges that needed to be processed and patients and their families needed to be educated about providing at-home care after being discharged from the Hospital.

152. In response, Smith asserted, "We don't need her."

## IV. NORTHWELL FAILS TO RESPOND TO DAVIS'S COMPLAINTS OF DISCRIMINATION, DENIES HER REQUEST TO CONTINUE WITH HER PREVIOUSLY APPROVED ACCOMMDATIONS WITHOUT ENGAGING IN AN INTERACTIVE PROCESS, AND FORCES DAVIS TO REMAIN OUT ON LEAVE

153. On May 8, 2026, after she was dismissed from work by Castro, Davis sent an email to TMHS's general email address.

154. In the email, Davis stated that Castro had sent her home from work that day because Northwell had not approved her request to continue working with her lifting and standing accommodations beyond May 3, 2026.

155. Davis then asked if there was anything she needed to do before the Hospital issued a decision on her request.

156. Caggiano responded that she was not aware of anything else the Hospital needed from Davis related to her request.

157. Next, Davis contacted HR through the Hospital's virtual helpdesk chat (Helpdesk Request No. SR1255151).

158. Through the virtual helpdesk chat, Davis made the following complaint:

> Hi Shakira, yes I had some concerns in regard to my light duty accommodations. I wanted to discuss my current work status and accommodations during my pregnancy. My doctor has provided light-duty restrictions, and I am willing and able to continue working within those restrictions. However, on multiple scheduled shifts, I've been told to go home or use my own accrued time instead of being accommodated. I'm concerned because other employees requiring light duty have reportedly been accommodated, and I want to make sure I'm being treated consistently and fairly. I also need to preserve my accrued leave for my maternity recovery and time after the baby is born. I'm not looking for conflict — I want to continue working safely and productively within my medical restrictions. Can we work together to identify a reasonable accommodation or available light-duty assignment so I don't continue losing scheduled work time and benefits? I'd also appreciate clarification on the hospital's policy regarding pregnancy-related accommodations and light duty.

Ex. F (Communications Between Davis and Shakira via Northwell's Helpdesk Chat).

159. The other employees referenced in the above-referenced message by Davis are Coutrney and Kristen Medlicott ("Medlicott"), an RN in the Oncology Med-Surg Unit.

160. In 2025, Courtney was allowed to work in the Light-Duty RN role for around six weeks following a surgery and Medlicott worked in the Light-Duty RN role for several weeks.

161. Neither Courtney nor Medlicott were pregnant when they worked in the Light-Duty RN role in 2025.

162. Shakira, an HR employee, responded and told Davis to contact TMHS concerning her complaint. *See id.*

163. Davis replied, "[T]he accommodation has been approved by employee health, but I am being sent home early and told not to come in due to the census. [I]s there someone I can speak with in regards to the Pregnancy Workers Fairness Act?" *Id.*

164. Shakira then stated that she would forward Davis's request to Team Member Concerns for further review and that Davis should expect a response in one to five business days. *Id.*

165. Davis then asked, "Is there a phone number I would be able to reach them at sooner than that? I am supposed to return to work tomorrow but my manager is telling me to stay home." *Id.*

166. Shakira said she did not have a number to provide to Davis. *Id.*

167. Later that day, Caroline Zhang ("Zhang"), an Employee Relations Specialist[3] at Northwell, called Davis related to her complaint of discrimination.

168. During the call, Zhang asked Davis what tasks she had been performing with her lifting and standing accommodations.

169. Davis told Zhang that she had, *inter alia*, (i) processed admissions, discharges, and transfer; (ii) updated patients' profiles; (iii) educated patients and their families concerning medications, treatments, and discharge instructions; (iv) started and maintained IV lines; (v)

[3] An Employee Relations Specialist is essentially an HR professional who focuses on workplace disputes, employee complaints, investigations, discipline, policy enforcement, and related employment issues.

administered IV fluids and prescribed infusions; (vi) checked patient's blood sugars; and (vii) helped fellow staff RNs with other tasks without incident.

170. Next, Zhang told Davis that a representative in a leadership position would contact her soon about her complaints.

171. Northwell scheduled Davis to work on May 9 and 12 and from May 14-22.

172. However, someone from the Hospital removed Davis from the work schedule for each of those days.

173. On May 9 and 12 and from May 14-22, the Oncology Med-Surg Unit had work that could have been completed by Daivs.

174. For example, on May 13, 2026, Richie Estimos, an RN working in the Oncology Med-Surg Unit was assigned to work in the Light-Duty RN/Facilitator role. *See* Ex. G (May 13, 2026 Text Message from Jessica Smtih).

175. On May 18, 2026, an RN named Ashley was called into work on her day off and worked in the Light-Duty RN/Facilitator role.

176. On May 20, 2026, Amber Dowty, an RN in the Oncology Med-Surg Unit, was called into the Hospital and worked additional hours in the Light-Duty RN/Facilitator role beginning at around 9:00 a.m. until about 3:00 p.m.

177. In mid- to late-May 2026, Kathryn Picciano ("Picciano"), an Assistant Nurse Manager, sent excluded Davis from an email sent to other RNs in the Oncology Med-Surg Unit in which she asked if anyone was interested in picking up overtime hours on May 27, 29, and/or 30. Ex. H (May 2026 Email from Kathryn Picciano).

178. On May 16, 2026, Davis sent the following complaint via email to Zhang:

Dear Caroline,

I am writing to you as I believe I am being discriminated against because I am pregnant, and I have requested and was granted accommodation related to my pregnancy. Unfortunately, beginning on Friday April 3, 2026, I began experiencing vaginal bleeding related to my pregnancy. As you may know, vaginal bleeding early in pregnancy can be concerning because it may signal a threatened miscarriage or other pregnancy-related complications that can require reduced physical activity, modified duties, additional breaks, or other workplace accommodations. Because of the bleeding, my OB/GYN stated that I needed workplace accommodations. Specifically, my OB/GYN said that I could not lift anything that weighs more than 10lbs and that I should limit continuous standing to 1-2 hours. On April 6, 2026, I informed my supervisor, Catherine Castro, about my vaginal bleeding and the doctor's order of need for accommodation. Her response placed doubt that I could work in our unit's light duty position with those restrictions.

The next day, April 7, Catherine informed me I needed to submit my request for accommodations to Employee Health and call out sick for that week. That same day, I submitted my request for accommodations to Employee Health and provided them with a letter from my OB/GYN relating to my need for pregnancy accommodations. On 4/10, I was seen in the Employee Health office and was granted approval for my request, permitting me to return to work on light duty. I informed Catherine about the approval, Catherine again claimed that it was unlikely that I could perform the role of a light-duty RN. However, I was not told me what tasks I would not be able to complete with accommodations. Instead, she refused to allow me back to work (including my request to complete mandatory online education) until there was an "official decision" from Team Member Services, forcing me to use my accrued PTO.

On April 10, 2026, Catherine and Employee Health claimed that the letter from my OB/GYN was not specific enough. On April 13, 2026, I sent an updated letter from my OB/GYN which states "The patient is requesting the following accommodations form 4/7-5/3. Limiting lifting to under 10 lbs, standing up to 2 hours at a time, with 5-minute breaks in between. Pt is able to work 12.5 hour shifts up to 4 days a week with no restrictions on walking." The next day, Employee Health approved my request for accommodations for April 14 to May 3. On April 29, 2026, after being seen in my OB/GYNs office, I provided Employee Health with another letter from my doctor stating that my accommodations needed to be extended through June 24. Employee Health confirmed receipt of the letter and approved the extension via telephone call the same day.

Even though my request for accommodations was approved since I first put my request in, Catherine or other nursing supervisors either did not allow me to report to work or sent me home early claiming there was no work for me to do which was not true. For the last week and the next few weeks, I have been removed from scheduled shifts, effectively revoking Employee Health's decision granting my request for accommodations. On May 8, 2026, I contacted HR and complained

> about being discriminated against because of my pregnancy accommodations. In the complaint, I explained that I have been told to go home early on multiple occasions or not scheduled on shifts. I also said that I am being treated differently because of my pregnancy and pregnancy accommodations, because other employees who are not pregnant and who do not need accommodations are regularly being placed in what are considered light-duty roles. However, the hospital still has not taken any meaningful action in response to my complaints. I am ready and able to return to work with the accommodations my doctor has prescribed.
>
> When can I return to work?
>
> Also, what will the hospital do to address my complaint of discrimination?
>
> Additionally, will the hospital reinstate PTO time I have been forced to expend because I have been wrongly sent home early and denied work shifts?
>
> Thank you,
>
> Lorraine Davis

Ex. I (May 16, 2026 Email from Davis to Zhang).

179. On May 18, 2026, in connection with her complaints of discrimination, Davis received an email from Vanessa Sisto ("Sisto"), a Director of Employee Relations in the Hospital's Advice & Counsel Center. *See* Ex. J (May 18, 2026 Email from Sisto to Davis).

180. In her email, Sisto informed Davis that she was covering for Zhang who was out of the office and asked her whether she was able to independently perform life-saving techniques such CPR on patients. *See id.*

181. That afternoon, Davis responded with the following email:

> Hi Vanessa - Yes, I can perform life-saving techniques such as CPR.
>
> Even so, is it the hospital's position that I can only be a nurse if I can do CPR? There are many other tasks I can do as a nurse that do not require CPR or other perform life-saving techniques. It seems like the hospital is trying to force me out simply because I am pregnant.
>
> Also, on May 8, I had a conversation with my manager, Catherine about possibly working for another department while working with my requested accommodation.

> Neither Catherine nor anyone else at the hospital has gotten back to me about that possibility. Instead, I continue to be forced to stay out on leave even though I am able to work.
>
> Additionally, I made a complaint of discrimination to Caroline over the weekend. Has that been shared with you? I have copied the complaint below just in case. I'd like to understand what the hospital is going to do to address my complaint.
>
> Thanks,
>
> Lorraine Davis

*Id.*

182. Sisto responded the next day and told Davis that she opened a Human Resources investigation concerning her complaints of discrimination and would reach out to provide an update related to her request to continue with her previously approved accommodations as soon as possible. *See id.*

183. On May 21, 2026, Davis had a call with Lauren Willdigg ("Willdigg"), an Employee Relations Specialist at the Hospital, related to her complaints of discrimination.

184. During the call, Davis told Willdigg that, *inter alia*, (i) she was pregnant; (ii) she had vaginal bleeding earlier in her pregnancy; (iii) she had been approved to work with a lifting and standing accommodations from April 14, 2025 to May 3, 2026; (iv) Castro and other supervisors had forced her out on leave; (v) management had been having other RNs work overtime hours to perform light-duty work over the previous two weeks; (vi) she was being treated differently than non-pregnant RNs, including Courtney and Medlicott; and (vii) she had been forced to expend 136 hours of accrued paid time off she otherwise would not have had to expend if she had been allowed to continuing working with her accommodations.

185. In response, Willdigg told Davis that Northwell's treatment of her was unacceptable and she did the right thing by complaining to HR.

186. Davis then told Willdigg that the Hospital scheduled her to work on May 24, 2026.

187. Willdigg told Davis that she should report to work on May 24, 2026 and that if she was sent home from work that day, it would be "another strike" against the Hospital.

188. On May 23, 2026, Jeanne Brennan ("Brennan"), the Director of the Oncology Med-Surg Unit, called Davis and left her a voice message in which she told Davis that she was not scheduled to work the next day and that she should not report to work. *See* Ex. K (Screenshot of Transcript of Voicemail Recording by Brennan).

189. In response to the call from Brennan, Davis sent the following email to Willdigg:

> Hi Lauren,
>
> Just wanted to keep you abreast of the situation over the weekend. When we spoke on Thursday, I was on the schedule to work, coded for modified duty. I checked my schedule Friday, my shift was still there. Upon checking again on Saturday, I noted I was slotted for PTO use again for the entire week (again not contacted by anyone to let me know that was done). I contacted the staffing office (spoke to Kathleen) to confirm and to ask who removed me from the schedule. She said she wasn't able to tell who removed me, then asked me if I was on a leave of absence. I told her I was not. Kathleen then told me she would look into it and call me back. A few hours had gone by, so I called back and was told there was "no information for me[].["] I informed her I was told to report to work on Sunday, so she would see me clock in. She said "ok" and the conversation ended. Shortly after speaking with Kathleen, I received a call (went to voicemail) from Jeanne Brennan, Director of Med-Surg at the hospital. In her voicemail she stated she had spoken to the staffing office and wanted to clarify that I am not on the schedule, that I would not be able to work and if I did come in, I would be sent home. She also mentioned I would be receiving a "note" in the next week but did not clarify what that note would be. I have attached a screenshot of my schedule taken on Friday, and the removal on Saturday, as well as the voice-texted voicemail from Jeanne Brennan. Also, the 3.5 hours of mandatory education I had completed have been removed for a second time. Just want to re-iterate that there has been zero communication with me, both to taking me off the schedule and as to WHY I am STILL being forced to use PTO when my accommodations have been approved by Employee Health, and the call from Jeanne is the first communication I have received since being sent home on 5/8. I currently do not have a schedule at all after this coming week. Thanks again for your help, I really appreciate it.
>
> Lorraine

Ex. L (May 25, 2026 Email from Davis to Willdigg).

190. On May 26, 2026, Willdigg responded to Davis's email and said that she had a meeting scheduled with "leadership" the following week but would try to get the meeting move up to an earlier date. *Id.*

191. Later that day, Davis received a call from Nicole Butera ("Butera"), an Advisor in Employee Relations, and another employee named Brianna.

192. Toward the beginning of the call, Butera explained that she and Brianna were investigating Davis's complaints of discrimination.

193. Next, Davis reiterated her complaints of discrimination.

194. The call involving Davis, Butera, and Brianna last around one hour.

195. At the end of the call, Butera said that they would continue their investing Davis's complaints and that it could take weeks to months before they completed their investigation.

196. The next day, May 27, 2026, Zhang sent a letter to Davis in which she stated:

> Dear Lorraine:
>
> On or around April 10, 2026, Team Member Health Services ("TMHS") received your request for an accommodation based on temporary physical limitations specifically related to your pregnancy…
>
> Your request on April 10 and provider note dated April 7, 2026, requested "light duty" and identified the following restrictions through April 29, 2026:
>
> - Limit standing to no more than 4 hours
> - Limit walking to no more than 400 feet
> - No lifting or carrying
> - No pushing or pulling
> - No squatting, bending, or climbing
>
> On April 13, 2026, you submitted an updated note from your provider with the following restrictions from April 7 through May 3, 2026:
>
> - limiting lifting to under 10 lbs.

> - limit standing up to no more than 2 hours at a time, with 5-minute breaks in between
> - able to work 12.5-hour shifts, up to 4 days a week
>
> On April 14, 2026, we notified you that your accommodation request was approved on a temporary basis through May 3, 2026, while your initial and extended requests were under consideration. Specifically, during this time when patient census was high, the Hospital temporarily assigned you to admitting and discharging functions. While the transitional assignment was in effect, on or about April 30, 2026, you submitted an updated provider note to TMHS extending the same restrictions to June 24, 2026. In the interim, however, due to a drop in patient census, there no longer was sufficient work for you to do.
>
> Although ***the Hospital determined that the lifting and standing restrictions imposed by your provider would be accommodated and thus enable you to resume performing your regular RN duties***, when informed that you would be returned to your RN role as long as you were able to perform life saving techniques such as CPR, on May 8, 2026[,] you provided additional information: that you could not safely perform your RN duties due to intermittent bleeding associated with your pregnancy. As such, due to your inability to safely perform your essential duties with reasonable accommodation and the decrease in patient census, we informed you that you would be approved for time off with pay from your PTO accruals and leave as an alternative accommodation provided you followed applicable requirements. In addition, although the Hospital has been exploring the availability of other potential transitional assignments, no such alternative assignments are currently available…
>
> Sincerely,
>
> Caroline Zhang

Ex. M (May 27, 2026 Letter from Zhang to Davis) (emphasis added).

197. In other words, Northwell approved Davis to return to work in her regular RN position with her lifting and standing accommodations.

198. Northwell did not find that Davis could only be accommodated through the Light-Duty RN/Facilitator role.

199. Nevertheless, Northwell still forced Davis to remain out on leave.

200. Northwell justified keeping Davis out on forced leave based on (1) the assertion that Daivs informed the Hospital that she "could not safely perform [her] RN duties due to

intermittent bleeding associated with [her] pregnancy[]" and (2) the Oncology Med-Surg Unit not requiring a Light-Duty RN/Facilitator because of "a drop in patient census." *Id.*

201. Both of Northwell's justifications are false and clearly pretext for keeping Davis out on forced leave because she was pregnant.

202. First, Davis did not tell anyone at Northwell that she could not safely perform her RN duties because of vaginal bleeding.

203. Instead, as explained above, Davis requested lifting and standing accommodations related to her pregnancy and vaginal bleeding she experienced in early April 2026.

204. Northwell approved Davis's request and determined that she could perform her RN duties with her lifting and standing accommodations.

205. Davis successfully worked with her lifting and standing accommodations from April 20 to May 3 and on May 5 and 8, 2026 even though she was experiencing vaginal bleeding.

206. As stated above, on those days, Davis (i) processed admissions, discharges, and transfer; (ii) updated patients' profiles; (iii) educated patients and their families concerning medications, treatments, and discharge instructions; (iv) started and maintained IV lines; (v) administered IV fluids and prescribed infusions; (vi) checked patient's blood sugars; and (vii) helped fellow staff RNs with other tasks without incident.

207. Also, Northwell approved Davis's request even though the Hospital was on notice of Davis's vaginal bleeding from Davis's text message to Castro on April 6 and letters from Dr. Amorin dated April 13 and 29, 2026. *See* Exs. C and E at 3.

208. Additionally, at the time of Zhang's May 27 letter, Northwell as on notice from Dr. Amorin's April 29 letter that Davis was no longer experiencing vaginal bleeding. *See* Ex. E

("[Davis] has a high-risk pregnancy that has already been complicated by bleeding earlier in the pregnancy.").

209. Clearly, Northwell's claim that Davis told HR that she could not safely perform her RN duties, including CPR and other lifesaving techniques, because of non-existent vaginal bleeding is false.

210. Importantly, even if CPR and/or other life-saving techniques are an essential functions of Daivs's role as an RN and Davis could not perform CPR with her lifting and standing accommodations, Davis only requested to temporarily continue with those accommodations from May 4, 2026 through June 24, 2026.

211. Second, Northwell's assertion that there was no work for Davis in the Light-Duty/RN role because of "decrease in patient census" is not true.

212. Initially, it is not true that Davis could only be accommodated based on the availability of administrative work through the Light-Duty/Facilitator position.

213. Again, Northwell admitted that Davis could have worked in her role as an RN with her lifting and standing accommodations. *See* Ex. M ("[T]he Hospital determined that the lifting and standing restrictions imposed by your provider would be accommodated and thus enable you to resume performing your regular RN duties").

214. Nevertheless, even if it was lawful for Northwell to have arbitrarily limited Davis to administrative work in the Light-Duty/Facilitator role because she was pregnant, at the very least, there was work Davis could have performed on May 9 and 12 and from May 14-22, including work associated with the Light-Duty/Facilitator role. *See infra* ¶¶ 12-21, 171-77.

215. In a June 1, 2026 email to Zhang, Davis called out Northwell's bogus justifications for continuing to keep her out on leave:

Caroline,

You made several statements that are false.

Initially, your claim that the Hospital was not on notice of bleeding related to my pregnancy is not true. On April 6, 2026, I informed my supervisor Catherine that I was experiencing bleeding related to me pregnancy. Attached is a screenshot of text messages with Catherine related to the disclosure. The bleeding related to my pregnancy is also stated in a note from my doctor dates April 13, 2026. Additionally, my doctor's notes from April 29, 2026 references the bleeding. From April 14 to May 3, the Hospital allowed me to work with the accommodations referenced in my doctor's notes even though the Hospital had been informed multiple times that I was experiencing bleeding. During that time, I was working on admissions, discharges, patient profiles, education for patients, placing IVs, checking blood sugars, and helping other RNs with other tasks without issue.

Also, on May 8, 2026, Catherine placed me on a forced leave and in a clear act of discrimination because I am pregnant, temporarily disabled, and needed accommodations related to my pregnancy and temporary disability. That day, Catherine sent me home claiming that the census of the Hospital did not require a light duty RN at that time. No one from the Hospital ever discussed taking leave or engaged in any conversations or process about leave being a possible accommodation for my pregnancy or temporary disability. In fact, I never requested any leave and I don't need leave. I just need the Hospital to provide the same accommodations that I worked under from April 14 to May 3 and which are referenced in my doctor's notes. Also, the Hospital did not make its assertion that I was placed on forced leave because of bleeding until its letter to me dated May 27, 2026. As such, your claim that the Hospital placed me on forced leave because of bleeding does not make sense.

In addition to the false statements in your email, I also need to address the Hospital's threat to fire me if I do not file a request for a leave of absence with myAbsence. Again, the Hospital placed me on forced leave beginning May 8, 2026. I never requested leave and am not requesting leave now. Instead, I am simply requesting that I be permitted to continue under the accommodation I worked under from April 14 to May 3 and that the Hospital has already formally approved after receipt of my doctor's notes. Also, as I have stated, I can perform live-saving techniques and do not need any accommodation related to those techniques. Therefore, there is not anything preventing me from returning work. The Hospital's threat of termination is clearly continued discrimination against me because I am pregnant, am suffering from a temporary disability, and need accommodations related to pregnancy and disability. Indeed, the Hospital is attempting to use the leave it has forced me to take since May 8 (that I never requested) to force me to request leave so the Hospital can justify its conduct against me.

Additionally, I have several questions for you:

1. How did the Hospital determine that leave was the only "safe and reasonable accommodation" available related to my bleeding?

2. What other accommodations did the Hospital consider before unilaterally deciding that leave was the only "safe and reasonable accommodation" available related to my bleeding?

3. In connection with the process of determining that leave was the only "safe and reasonable accommodation" available, why didn't the Hospital communicate with me or engage in any process with me related to that accommodation?

4. What is the Hospital doing to "explore options in an effort to return [me] to work[?]"

5. In connection with your claim that the Hospital is exploring options or accommodations that would allow me to return to work, why isn't the Hospital communicating or engaging in any process me with related to those efforts?

6. What do you mean by transitional/temporary work?

7. Is it the Hospital's position that the only accommodation that it would grant to me that would allow me to return to work is transitional/temporary work? If so, how did the Hospital arrive at that determination?

When will you able to address my concerns and respond to my questions?

Sincerely,

Lorraine

Ex. N (June 1, 2026 Email from Davis to Zhang).

216. Incredibly, in a June 9, 2026 email in response to Davis's email, Zhang doubled down on Northwell's false justifications for keeping Davis out on leave. *See id.*

217. In that email, Zhang continued to assert that Davis told a TMHS representative that she could not safely perform her RN duties, including direct patient care and CPR, because of vaginal bleeding even though Davis had in fact performed patient care duties from April 20 to May 3 and on May 5 and 8 and had repeatedly stated that she could perform CPR even with her lifting and standing accommodations. *See id.*

218. Also, in response to the Hospital being on notice of Davis's vaginal bleeding from her April 6, 2026 text message to Castro and Dr. Amorin's letters, Zhang alleged that THMS redacted references to vaginal bleeding in Dr. Amorin's letters and HR had supposedly only recently learned about the vaginal bleeding. *See id.*

219. Additionally, Zhang reiterated the false claim of a "declining census and the absence of any other transitional assignment" as a justification for keeping Davis out on leave. *Id.*

220. Again, since Northwell forced Davis on leave starting May 8, 2026, there have been many assignments and jobs Davis could have completed in her role as an RN. *See supra* ¶¶ 12-21, 171-77.

221. Finally, Zhang relayed a threat to Davis that Northwell would fire if she did not put in for leave by June 15, 2026. *See id.*

222. In reply, Davis sent Zhang this email soon thereafter:

> Hi Caroline,
>
> I am not bleeding. In the note from April 29, my doctor said "She has a high-risk pregnancy that has already been complicated by bleeding earlier in the pregnancy." I am attaching the April 29 note again for your reference. For almost two weeks, the Hospital has been on notice from my doctor that I am not bleeding and that I was bleeding earlier in my pregnancy before the April 29 note from my doctor. Yet, the Hospital is still forcing me to stay out on leave and citing to bleeding as the only reason. Again, I just need the accommodations that the Hospital has already approved and which are referenced in my doctors' notes. Given this, why is the Hospital still forcing me to stay out on leave?
>
> Also, how did has the Hospital determined that I cannot perform my job duties because of bleeding? What was considered when making that decision without my input?
>
> You keep saying that "leave of absence [is] the only reasonable accommodation available" but have failed to explain why that is. The Hospital has also failed to engage in any conversations or communications about leave as an accommodation, possible alterative accommodations to leave, or why any possible alternative accommodations other than leave are not possible. This is a moot point however because the Hospital has already approved the accommodations that I need.

> Additionally, you did not answer the questions from my June 4 email. When will those responses be provided?
>
> Thanks,
>
> Lorraine

## V. NORTHWELL DENIES DAVIS'S REQUEST TO RETURN TO WORK WITH ACCOMMODATIONS WITHOUT ENGAGING IN ANY INTERACTIVE PROCESS AND THREATENS TO FIRE DAVIS IF SHE DID NOT REQUEST A LEAVE OF ABSENCE

223. As stated above, in her June 9, 2026 email to Davis, Zhang relayed a threat from Northwell to fire Davis if she did not apply for a leave of absence under the Family and Medical Leave Act ("FMLA"). *See* Ex. N at 2.

224. On June 14, 2026, although she did not need FMLA leave and because of Northwell's threat to terminate her employment, Davis submitted a request for FMLA leave through an online submission form provided by the Hospital's third-party claims administrator.

225. Davis requested FMLA leave from May 29, 2026 through June 27, 2026.

226. Davis also requested to return to work on June 28, 2026 with an accommodation to be exempt from lifting and turning patients.

227. After submitting her request for leave, Davis sent the following email to Zhang on June 15, 2026:

> Caroline,
>
> I am forwarding you the email confirmation of my request for a leave of absence. I was forced to file for the leave of absence because the Hospital threatened to terminate my employment if I did not do so. As I have already stated several times, I don't need leave and am ready and able to return to work with the accommodations the Hospital has already approved.
>
> Sincerely,
>
> Lorraine

Ex. O (June 15, 2026 Email from Davis to Zhang).

228. On June 17, 2026, Dr. Amorin provided Davis with this letter in support of her request for accommodations:

> Dear sir [o]r Madam,
>
> Ms. Lorraine Davis is a patient under my obstetrical care with a due[] date of 11/4/26. She has not had vaginal bleeding in the last month and sonogram today shows a normal cervical length. We have given her permission to return to work as an RN starting 6/28/26, but MUST NOT lift o[r] turn patients during her shift. Please provide her accommodations for this. Thank you.
>
> Sincerely,
>
> Dr. Lisa Amorin

Ex. P (June 17, 2026 Letter from Dr. Amorin).

229. On June 18, 2026, Davis received a confirmation that Northwell was in receipt of Dr. Amorin's June 17 letter.

230. On June 22, 2026, Nicole DelVecchio ("DelVecchio"), a Wellness Liaison for the Hospital, sent Davis an email asking Davis to call her in connection with her request to return to work with accommodations.

231. Later that day, Davis had a roughly eight-minute call with DelVecchio concerning her request for accommodations.

232. During the call, DelVecchio asked Davis to have Dr. Amorin submit another letter stating whether Davis could lift and turn patients with the assistance of another employee or if she was prohibited from lifting or turning patients at all.

233. On June 26, 2026, Dr. Amorin provided Davis with the following letter:

> To Whom It May Concern,

> The above-referenced patient is under my obstetrical care with a due[] date of 11/4/26. We have given her permission to return to work as an RN starting 6/28/26, but MUST NOT lift or turn patients [] AT ALL during her shift, either by herself or with assistance. Please provide her accommodations for avoiding all lifting and turning.
>
> Thank you.
>
> Should you have any further questions, please contact the office at 631-775-3290.
>
> Sincerely,
>
> Lisa Amorin, MD

Ex. Q (June 26, 2026 Letter from Dr. Amorin).

234. Next, Davis visited the TMHS's office on June 29, 2026 for a meeting related to her request for accommodations.

235. At the TMHS's office, Davis met with a TMHS employee for about 15 minutes.

236. At the end of the meeting, the TMHS employee told Davis that she would process Davis's request.

237. On July 2, 2026, Sisto sent Davis a letter in which she stated that Northwell had denied her request to return to work with accommodations on June 28, 2026. Ex. R (July 2, 2026 Letter from Sisto).

238. To justify the decision, Sisto claimed that Davis's request for an accommodation to be exempt from lifting and turning patients prevented her from performing the essential functions of her job. *See id.*

239. As mentioned earlier, an RN typically spends a total of only a few minutes lifting and turning patients, and those limited instances can be safely performed with the assistance of other hospital staff and/or mechanical lifting and repositioning equipment.

240. As such, personally lifting or turning patients constitutes only a minor and incidental part of the RN's work and is not an essential function of the RN position.

241. Even if lifting and turning were essential functions of the RN role, Davis would have only temporarily been unable to perform those essential functions because she only requested to continue work with her accommodations from June 28, 2026 through October 28, 2026.

242. Sisto also claimed that "The Hospital also investigated whether there is any current opportunity to have you return to perform limited administrative functions; however, currently this work is not available." *Id.*

243. To date, Defendants have not considered or discussed with Davis reasonable changes to her role as an RN that would allow her to continue working with her requested accommodations or any opportunities to work in the Light-Duty/Facilitator role or a position related to other administrative work.

244. Also, Northwell's decision to force Davis out on leave has caused her to expend accrued paid time off that she otherwise would not have been required to use and that she had planned to use, at least in part, to care for herself and her baby after giving birth.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE PWFA: DISCRIMINATION**
(*Against Defendant Northwell*)

245. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

246. During the full statutory period, Plaintiff was protected by the provisions of the PWFA, 42 U.S.C. § 2000gg, *et seq.*, and all applicable regulations thereunder.

247. During the full statutory period, Northwell was a covered entity subject to the provisions of the PWFA, 42 U.S.C. § 2000gg, *et seq.*, and all applicable regulations thereunder.

248. At all relevant times, Plaintiff was a qualified employee within the meaning of the PWFA, was pregnant, and had known limitations related to, affected by, or arising out of her pregnancy and/or related medical conditions.

249. As set forth above, Plaintiff informed Northwell of her pregnancy, pregnancy-related limitations, and her need for reasonable accommodations related to her pregnancy and pregnancy-related limitations.

250. Plaintiff requested reasonable accommodations related to her pregnancy and pregnancy-related limitations that would have permitted her to continue performing her job without imposing an undue hardship upon Northwell.

251. As set forth above, Northwell violated the PWFA by, *inter alia*, failing and refusing to provide Plaintiff with reasonable accommodations for her pregnancy and known pregnancy-related limitations, failing to meaningfully engage with Plaintiff concerning reasonable accommodations related to her pregnancy and pregnancy-related limitations, denying Plaintiff equal employment opportunities because of her pregnancy and need for reasonable accommodations related to her pregnancy and pregnancy-related limitations, and taking adverse employment actions against Plaintiff because she was pregnant and requested and/or required reasonable accommodations related to her pregnancy and pregnancy-related limitations, including forcing Plaintiff to take FMLA leave.

252. Northwell's unlawful actions were intentional and undertaken with deliberate, willful, wanton, and reckless indifference to Plaintiff's protected rights under the PWFA.

253. As a direct and proximate result of Northwell's unlawful conduct in violation of the PWFA, Plaintiff has suffered and continues to suffer economic loss, emotional distress, and other damages for which she is entitled to relief to the greatest extent permitted by law.

254. Plaintiff is further entitled to all available legal and equitable relief, including compensatory damages, back pay, front pay and/or other equitable relief, prejudgment interest, and reasonable attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE PWFA: RETALIATION**
(*Against Defendant Northwell*)

255. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

256. During the full statutory period, Plaintiff was protected by the provisions of the PWFA, 42 U.S.C. § 2000gg, *et seq.*, and all applicable regulations thereunder.

257. During the full statutory period, Northwell was a covered entity subject to the provisions of the PWFA, 42 U.S.C. § 2000gg, *et seq.*, and all applicable regulations thereunder.

258. As set forth above, Plaintiff engaged in protected activities by, *inter alia*, requesting reasonable accommodations related to her pregnancy and pregnancy-related limitations and lodging complaints of pregnancy discrimination.

259. Northwell retaliated against Plaintiff for her protected activities in violation of the PWFA by, *inter alia*, failing and refusing to provide Plaintiff with reasonable accommodations for her pregnancy and known pregnancy-related limitations, failing to meaningfully engage with Plaintiff concerning reasonable accommodations related to her pregnancy and pregnancy-related limitations, denying Plaintiff equal employment opportunities because of her pregnancy and need for reasonable accommodations related to her pregnancy and pregnancy-related limitations, and taking adverse employment actions against Plaintiff because she was pregnant and requested and/or required reasonable accommodations related to her pregnancy and pregnancy-related limitations, including forcing Plaintiff to take FMLA leave.

260. Northwell's unlawful actions were intentional and undertaken with deliberate, willful, wanton, and reckless indifference to Plaintiff's protected rights under the PWFA.

261. As a direct and proximate result of Northwell's unlawful conduct in violation of the PWFA, Plaintiff has suffered and continues to suffer economic loss, emotional distress, and other damages for which she is entitled to relief to the greatest extent permitted by law.

262. Plaintiff is further entitled to all available legal and equitable relief, including compensatory damages, back pay, front pay and/or other equitable relief, prejudgment interest, and reasonable attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
**VIOLATIONS OF THE TITLE VII: DISCRIMINATION**
(*Against Defendant Northwell*)

263. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

264. During the full statutory period, Plaintiff was protected by the provisions of Title VII, 42 U.S.C. §§ 2000e, *et seq*., and all applicable regulations thereunder.

265. During the full statutory period, Northwell was a covered entity subject to the provisions of Title VII, 42 U.S.C. §§ 2000e, *et seq*., and all applicable regulations thereunder.

266. At all relevant times, Plaintiff was a qualified employee within the meaning of Title VII, was pregnant, and had known limitations related to, affected by, or arising out of her pregnancy and/or related medical conditions.

267. As set forth above, Plaintiff informed Northwell of her pregnancy, pregnancy-related limitations, and her need for reasonable accommodations related to her pregnancy and pregnancy-related limitations.

268. As set forth above, Northwell violated Title VII by, *inter alia*, failing and refusing to provide Plaintiff with reasonable accommodations for her pregnancy and known pregnancy-related limitations, failing to meaningfully engage with Plaintiff concerning reasonable accommodations related to her pregnancy and pregnancy-related limitations, denying Plaintiff equal employment opportunities because of her pregnancy and need for reasonable accommodations related to her pregnancy and pregnancy-related limitations, and taking adverse employment actions against Plaintiff because she was pregnant and requested and/or required reasonable accommodations related to her pregnancy and pregnancy-related limitations, including forcing Plaintiff to take FMLA leave.

269. Northwell's unlawful actions were intentional and undertaken with deliberate, willful, wanton, and reckless indifference to Plaintiff's protected rights under Title VII.

270. As a direct and proximate result of Northwell's unlawful conduct in violation of Title VII, Plaintiff has suffered and continues to suffer economic loss, emotional distress, and other damages for which she is entitled to relief to the greatest extent permitted by law.

271. Plaintiff is further entitled to all available legal and equitable relief, including compensatory damages, back pay, front pay and/or other equitable relief, prejudgment interest, and reasonable attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
**VIOLATIONS OF THE TITLE VII: RETALIATION**
(*Against Defendant Northwell*)

272. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

273. During the full statutory period, Plaintiff was protected by the provisions of Title VII, 42 U.S.C. §§ 2000e, *et seq*., and all applicable regulations thereunder.

274. During the full statutory period, Northwell was a covered entity subject to the provisions of Title VII, 42 U.S.C. §§ 2000e, *et seq*., and all applicable regulations thereunder.

275. As set forth above, Plaintiff engaged in protected activities by, *inter alia*, requesting reasonable accommodations related to her pregnancy and lodging complaints of pregnancy discrimination.

276. Northwell retaliated against Plaintiff for her protected activities in violation of Title VII by, *inter alia*, failing and refusing to provide Plaintiff with reasonable accommodations for her pregnancy and known pregnancy-related limitations, failing to meaningfully engage with Plaintiff concerning reasonable accommodations related to her pregnancy and pregnancy-related limitations, denying Plaintiff equal employment opportunities because of her pregnancy and need for reasonable accommodations related to her pregnancy and pregnancy-related limitations, and taking adverse employment actions against Plaintiff because she was pregnant and requested and/or required reasonable accommodations related to her pregnancy and pregnancy-related limitations, including forcing Plaintiff to take FMLA leave.

277. Northwell's unlawful actions were intentional and undertaken with deliberate, willful, wanton, and reckless indifference to Plaintiff's protected rights under Title VII.

278. As a direct and proximate result of Northwell's unlawful conduct in violation of Title VII, Plaintiff has suffered and continues to suffer economic loss, emotional distress, and other damages for which she is entitled to relief to the greatest extent permitted by law.

279. Plaintiff is further entitled to all available legal and equitable relief, including compensatory damages, back pay, front pay and/or other equitable relief, prejudgment interest, and reasonable attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
**VIOLATIONS OF THE ADA: DISCRIMINATION**
(*Against Defendant Northwell*)

280. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

281. During the full statutory period, Plaintiff was protected by the provisions of the ADA, 42 U.S.C.A. § 12101, *et seq.*, and all applicable regulations thereunder.

282. During the full statutory period, Northwell was subject to the provisions of the ADA, 42 U.S.C.A. § 12101, *et seq.*, and all applicable regulations thereunder.

283. At all relevant times, Plaintiff was a qualified employee within the meaning of the ADA and had a known disability related to, affected by, or arising out of her pregnancy and/or related medical conditions.

284. As set forth above, Plaintiff informed Northwell of her pregnancy-related disability, and her need for reasonable accommodations related to that disability.

285. As set forth above, Northwell discriminated against Plaintiff on the basis of her actual or perceived disabilities in violation of the ADA, by, *inter alia*, failing and refusing to provide Plaintiff with reasonable accommodations for her known pregnancy-related disability, failing to meaningfully engage with Plaintiff concerning reasonable accommodations related to her pregnancy-related disability, denying Plaintiff equal employment opportunities because of her pregnancy-related disability and need for reasonable accommodations related to her pregnancy-related disability, and taking adverse employment actions against Plaintiff because she had a pregnancy-related disability and requested and/or required reasonable accommodations related to her pregnancy-related disability, including forcing Plaintiff to take FMLA leave.

286. Northwell's unlawful actions were intentional and undertaken with deliberate, willful, wanton, and reckless indifference to Plaintiff's protected rights under the ADA.

287. As a direct and proximate result of Northwell's unlawful conduct in violation of the ADA, Plaintiff has suffered and continues to suffer economic loss, emotional distress, and other damages for which she is entitled to relief to the greatest extent permitted by law.

288. Plaintiff is further entitled to all available legal and equitable relief, including compensatory damages, back pay, front pay and/or other equitable relief, prejudgment interest, and reasonable attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
**VIOLATIONS OF THE ADA: RETALIATION**
(*Against Defendant Northwell*)

289. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

290. During the full statutory period, Plaintiff was protected by the provisions of the ADA, 42 U.S.C.A. § 12101, *et seq.*, and all applicable regulations thereunder.

291. During the full statutory period, Northwell was subject to the provisions of the ADA, 42 U.S.C.A. § 12101, *et seq.*, and all applicable regulations thereunder.

292. As set forth above, Plaintiff engaged in protected activities by, *inter alia*, requesting reasonable accommodations related to her pregnancy-related disability and lodging complaints of disability discrimination.

293. Northwell retaliated against Plaintiff for her protected activities in violation of the ADA by, *inter alia*, failing and refusing to provide Plaintiff with reasonable accommodations for her known pregnancy-related disability, failing to meaningfully engage with Plaintiff concerning reasonable accommodations related to her pregnancy-related disability, denying Plaintiff equal

employment opportunities because of her pregnancy-related disability and need for reasonable accommodations related to her pregnancy-related disability, and taking adverse employment actions against Plaintiff because she had a pregnancy-related disability and requested and/or required reasonable accommodations related to her pregnancy-related disability, including forcing Plaintiff to take FMLA leave.

294. Northwell's unlawful actions were intentional and undertaken with deliberate, willful, wanton, and reckless indifference to Plaintiff's protected rights under the ADA.

295. As a direct and proximate result of Northwell's unlawful conduct in violation of the ADA, Plaintiff has suffered and continues to suffer economic loss, emotional distress, and other damages for which she is entitled to relief to the greatest extent permitted by law.

296. Plaintiff is further entitled to all available legal and equitable relief, including compensatory damages, back pay, front pay and/or other equitable relief, prejudgment interest, and reasonable attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION
## VIOLATIONS OF THE NYSHRL: DISCRIMINATION
(*Against All Defendants*)

297. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

298. During the full statutory period, Plaintiff was protected by the provisions of the NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

299. During the full statutory period, Defendants were subject to the provisions of the NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

300. At all relevant times, Plaintiff was a qualified employee within the meaning of the NYSHRL, was pregnant, had known limitations related to, affected by, or arising out of her pregnancy and/or related medical conditions, and suffered from a pregnancy-related disability.

301. As set forth above, Plaintiff informed Northwell of her pregnancy, pregnancy-related limitations, pregnancy-related disability, and her need for reasonable accommodations related to her pregnancy, pregnancy-related limitations, and pregnancy-related disability.

302. As set forth above, Northwell discriminated against Plaintiff on the basis of her pregnancy and actual or perceived disabilities in violation of the NYSHRL, by, *inter alia*, failing and refusing to provide Plaintiff with reasonable accommodations for her pregnancy, known pregnancy-related limitations, and known pregnancy-related disability; failing to meaningfully engage with Plaintiff concerning reasonable accommodations related to her pregnancy, pregnancy-related limitations, and pregnancy-related disability; denying Plaintiff equal employment opportunities because of her pregnancy, pregnancy-related limitations, pregnancy-related disability, need for reasonable accommodations related to her pregnancy, pregnancy-related disability, and pregnancy-related limitations, and taking adverse employment actions against Plaintiff because she was pregnant, suffered from a pregnancy-related disability, and requested and/or required reasonable accommodations related to her pregnancy, pregnancy-related disability, and pregnancy-related limitations, including forcing Plaintiff to take FMLA leave.

303. Northwell's unlawful actions were intentional and undertaken with deliberate, willful, wanton, and reckless indifference to Plaintiff's protected rights under the NYSHRL.

304. As a direct and proximate result of Northwell's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer economic loss, emotional distress, and other damages for which she is entitled to relief to the greatest extent permitted by law.

305. Plaintiff is further entitled to all available legal and equitable relief, including compensatory damages, back pay, front pay and/or other equitable relief, prejudgment interest, and reasonable attorneys' fees and costs.

**EIGHTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYSHRL: RETALIATION**
(*Against All Defendants*)

306. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

307. During the full statutory period, Plaintiff was protected by the provisions of NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

308. During the full statutory period, Defendants were subject to the provisions of NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

309. As set forth above, Plaintiff engaged in protected activities by, *inter alia*, requesting reasonable accommodations related to her pregnancy, pregnancy-related disability, pregnancy-related limitations and lodging complaints of pregnancy and disability discrimination.

310. Northwell retaliated against Plaintiff for her protected activities in violation of the NYSHRL by, *inter alia*, failing and refusing to provide Plaintiff with reasonable accommodations for her pregnancy, known pregnancy-related limitations, and known pregnancy-related disability; failing to meaningfully engage with Plaintiff concerning reasonable accommodations related to her pregnancy, pregnancy-related limitations, and pregnancy-related disability; denying Plaintiff equal employment opportunities because of her pregnancy, pregnancy-related limitations, pregnancy-related disability, need for reasonable accommodations related to her pregnancy, pregnancy-related disability, and pregnancy-related limitations, and taking adverse employment actions against Plaintiff because she was pregnant, suffered from a pregnancy-related disability,

and requested and/or required reasonable accommodations related to her pregnancy, pregnancy-related disability, and pregnancy-related limitations, including forcing Plaintiff to take FMLA leave.

311. Northwell's unlawful actions were intentional and undertaken with deliberate, willful, wanton, and reckless indifference to Plaintiff's protected rights under the NYSHRL.

312. As a direct and proximate result of Northwell's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer economic loss, emotional distress, and other damages for which she is entitled to relief to the greatest extent permitted by law.

313. Plaintiff is further entitled to all available legal and equitable relief, including compensatory damages, back pay, front pay and/or other equitable relief, prejudgment interest, and reasonable attorneys' fees and costs.

**NINTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYSHRL: AIDING AND ABETTING**
(*Against Defendant Castro*)

314. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

315. During the full statutory period, Plaintiff was protected by the provisions of NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

316. During the full statutory period, Defendant Castro was subject to the provisions of NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

317. Defendant Castro knowingly aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYSHRL by, *inter alia*, denying her equal terms and conditions of employment because of her pregnancy, pregnancy-related limitations, and pregnancy-related disability and supporting Northwell's decision to (i) refuse to

provide Plaintiff with reasonable accommodations related to her pregnancy, pregnancy-related disability, and pregnancy-related limitations; (ii) meaningfully engage with Plaintiff concerning reasonable accommodations related to her pregnancy, pregnancy-related disability, and pregnancy-related limitations; and (iii) taking adverse employment actions against Plaintiff because she was pregnant, suffered from a pregnancy-related disability, and requested and/or required reasonable accommodations related to her pregnancy, pregnancy-related disability, and pregnancy-related limitations, including forcing Plaintiff to take FMLA leave.

318. Castro's unlawful actions were intentional and undertaken with deliberate, willful, wanton, and reckless indifference to Plaintiff's protected rights under the NYSHRL.

319. As a direct and proximate result of Castro's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer economic loss, emotional distress, and other damages for which she is entitled to relief to the greatest extent permitted by law.

320. Plaintiff is further entitled to all available legal and equitable relief, including compensatory damages, back pay, front pay and/or other equitable relief, prejudgment interest, and reasonable attorneys' fees and costs.

**TENTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL § 740**
(*Against All Defendants*)

321. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

322. During the full statutory period, Plaintiff was protected by the provisions of the PWFA, Title VII, the ADA, and the NYSHRL, and all applicable regulations thereunder.

323. During the full statutory period, Defendants were subject to the provisions of the PWFA, Title VII, the ADA, and the NYSHRL, and all applicable regulations thereunder.

324. As set forth above, Plaintiff engaged in protected activities by, *inter alia*, requesting reasonable accommodations related to her pregnancy, pregnancy-related disability, pregnancy-related limitations and lodging complaints of pregnancy and disability discrimination.

325. Defendants retaliated against Plaintiff for her protected activities in violation of the NYLL § 740 by, *inter alia*, failing and refusing to provide Plaintiff with reasonable accommodations for her pregnancy, known pregnancy-related limitations, and known pregnancy-related disability; failing to meaningfully engage with Plaintiff concerning reasonable accommodations related to her pregnancy, pregnancy-related limitations, and pregnancy-related disability; denying Plaintiff equal employment opportunities because of her pregnancy, pregnancy-related limitations, pregnancy-related disability, need for reasonable accommodations related to her pregnancy, pregnancy-related disability, and pregnancy-related limitations, and taking adverse employment actions against Plaintiff because she was pregnant, suffered from a pregnancy-related disability, and requested and/or required reasonable accommodations related to her pregnancy, pregnancy-related disability, and pregnancy-related limitations, including forcing Plaintiff to take FMLA leave.

326. Defendants' unlawful and retaliatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYLL § 740.

327. As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYLL § 740, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law.

328. Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants containing the following relief:

A. A declaratory judgment that the practices complained of herein are unlawful under applicable federal and State law;

B. An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C. An award of damages, in an amount to be determined at trial, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D. An award of damages, in an amount to be determined after a trial, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, *inter alia*, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

E. An award of damages, in an amount to be determined at trial, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

F. An award of damages, in an amount to be determined after a trial, for any and all other monetary and/or non-monetary losses she has suffered;

G. An award of prejudgment interest on the damages she is awarded to the greatest extent permitted by law;

H. An award of punitive damages;

I. Reinstatement;

J. An award of reasonable attorneys' fees and costs that Plaintiff has incurred in this action to the greatest extent permitted by law; and

K. Such other and further relief that the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues of fact and damages.

Dated: October 22, 2026
Queens, New York

**CRABILL PLLC**

By: ______________________
Taylor J. Crabill

71-01 Austin Street
Forest Hills, New York 11375
Tel: (727) 335-1030
tcrabill@crabilllawfirm.com

*Attorney for Plaintiff*